tained of her residence in Florida more than three years before the bringing of the suit; and that, although defendant has a sister residing in Chicago, the petitioner has never communicated with her to ascertain his wife's residence, although he knew that for some period after the separation the defendant resided there with her sister.

The petitioner has destroyed the letters written to him by his wife, which, in the absence of other proof, might be of service to him in this suit, and, under the circumstances of the case, I am constrained to advise that he has produced no sufficient legal evidence of his right to relief as prayed.

*Mr. James Chapman* and *Mr. J. D. Manning*, for the appellant.

Per Curiam.

This decree unanimously affirmed, for the reasons given by the advisory master.

---

Richard P. Terhune et al., appellants,

*v.*

The Hackensack Savings Bank, respondent.

---

Richard P. Terhune et al., appellants,

*v.*

William E. Skinner, receiver, respondent.

---

A conveyance of lands and personal property made on January 1st, 1880, was held fraudulent as against the grantor's judgment creditor, whose judgment was recovered November 3d, 1880, for money loaned January 16th, 1878, although the creditor's bill was not filed until March 7th, 1888, and the defendant insisted upon the statute of limitations as to the personalty.

Terhune *v.* Hackensack Savings Bank.

On appeal from two decrees advised by *Henry C. Pitney, Esq.,* advisory master.

*Mr. John Linn,* for the appellants.

These cases were heard together, before *Advisory Master Pitney,* upon the evidence taken orally before him.

They embrace substantially the same questions.

The suit of Skinner, receiver, was for the purpose of setting aside a sale of certain personal property conveyed to and in possession of The R. P. Terhune Manufacturing Company, and applying it to the payment of a judgment in favor of The Hackensack Savings Bank against Richard P. Terhune, and the suit of The Hackensack Savings Bank was for the purpose of setting aside a sale of certain real estate made to the same company, and applying it to the payment of the same judgment.

The history of these cases is simply the following:

On the 1st day of January, 1880, Richard P. Terhune was indebted to various persons in very considerable amounts, and among his creditors was The Hackensack Savings Bank, to the amount of a little over $3,000. He also, at the same time, owed to his wife and his mother-in-law from $7,000 to $10,000, which they had advanced and loaned to him to aid him in his financial struggle. He had been a prosperous business man in Hackensack for over thirty years, and had accumulated a very respectable fortune, but he unfortunately became involved in behalf of the New Jersey Midland Railway Company, and when that company failed it came very near sweeping everything which he had away from him. The railroad failed in 1873 or 1874. But Mr. Terhune kept on paying and paying, until he had paid out the greater part of his fortune, and had paid away a considerable amount of his wife's and mother-in-law's means. In 1880, however, he had enough left to liquidate all of his indebtedness in full, provided he could realize all of the debts that were due to him.

In this condition of things he deemed it his duty to secure, at all events, to his wife and Mrs. Ackerman the moneys which they had loaned to him.

Is there a living, rational being who can say that this intention was fraudulent or dishonest?

The means which he adopted may have been ill-advised. They may have been such as naturally lead to the suspicion that something more or something else was intended than the security of these moneys which had been advanced to him. But that the purpose of securing these moneys, so far as it entered into his arrangements and disposition of his property, was an honest and lawful one, cannot be questioned by any right-thinking person.

Having this object then in view, without taking counsel or advice as to the best method of accomplishing what he desired, he conceived and carried out the plan which has given rise to all these proceedings, and which, if the judgment of the lower court is sustained, takes from the wife and the widow money which they thought was secured to them, and gives it to other creditors much more competent to take care of themselves.

Mr. Terhune, in his answer to the suit of Skinner, relates, under oath, how this matter originated and how it has been conducted and carried on, and gives his reasons for it, and there is no one to contradict him.

Mrs. Ackerman, in her answer, gives her version, so far as she knew anything about this matter, and there is nobody to contradict her.

And Mrs. Terhune relates what she knows about the same transaction, and there is nobody to contradict her.

Under this condition of things, three questions naturally arise:

*First.* Was this plan conceived and carried out, and was this property conveyed to The R. P. Terhune Manufacturing Company by Richard P. Terhune, to hinder, delay or defeat his creditors in the collection of their claims against him, or was his object, what he declares it was, simply to pay or secure his wife and mother-in-law for the moneys which they had advanced to him?

*Second.* If the object of R. P. Terhune was to hinder, delay or defeat his creditors, did Mrs. Ackerman and Mrs. Terhune unite with him in that purpose, or did they honestly accept the

results of these conveyances in payment of their claims against him, or as security for the same?

*Third.* Does or does not the statute of limitations, or the lapse of time, under the circumstances of this case, interpose any bar against the complainant in seeking to set aside these sales?

I. First, then, was this transaction fraudulent on the part of R. P. Terhune?

1. There is not a particle of evidence of fraud, excepting only as that inference may be drawn from the facts stated by Mr. Terhune himself.

2. He denies it absolutely, and declares his purpose to have been solely to pay or secure to his wife and Mrs. Ackerman the money they had loaned to him.

3. The inference of fraud which is sought to be drawn from this transaction is based entirely and solely upon the fact that, by the arrangement entered into and carried out, R. P. Terhune was left in the possession and control of the property substantially as he had been before the sale.

4. While this may fairly be considered as a circumstance among others from which the inference of fraud may be drawn, it is not at all conclusive, and is only one fact which alone will not establish the fraudulent intent.

II. If the purpose of R. P. Terhune in making this disposition of his property was a fraudulent one, did Mrs. Ackerman and Mrs. Terhune participate in that fraudulent intent?

1. There is no pretence and not a syllable of testimony in the whole case indicating any fraud upon their part.

2. There can be no pretence but that they had loaned R. P. Terhune a large amount of money, which they believed to be secured by this arrangement which he had made in organizing the company, conveying the property to it, and then issuing and holding the stock for their benefit.

3. The precise and definite amount of these loans may not appear as clearly as they should, but that they were large is unquestionable, and further evidence upon a reference can determine their exact amount with certainty.

4. If Mrs. Ackerman and Mrs. Terhune honestly and in good faith accepted the results of this arrangement in payment of, or as security for, their loans, they are entitled to the benefit of them, no matter to what extent the intention of fraud may have entered into the mind of R. P. Terhune in making the arrangement. *Van Keuren* v. *McLaughlin, 4 C. E. Gr. 187; Green* v. *Tanner, 8 Metc. 411; Sands* v. *Hildreth, 14 Johns. 493; Astor* v. *Wells, 4 Wheat. 466; Kerr Fr. & Mis. 201; Smith* v. *Vreeland, 1 C. E. Gr. 201; Demarest* v. *Terhune, 3 C. E. Gr. 532; Atwood* v. *Impson, 5 C. E. Gr. 150; New York Fire Ins. Co.* v. *Tooker, 8 Stew. Eq. 408.*

III. Does the statute of limitations, or the lapse of time during which this transaction has been allowed to stand, under the circumstances of this case, interpose any bar against the complainant to set aside this sale?

1. The master who decided this case has held that, so far as the real estate is concerned, this statute, or the lapse of time, interposes no bar.

2. As to the personal property he has simply evaded the question without giving any opinion upon it, but in the decree which he advised has virtually overruled it, and given the complainants everything they could ask, in entire disregard of the statute, and of the principle invoked.

3. As to the personal property the statute is unquestionably a bar to the complainant's claim. *Kerr Fr. & Mis. 303; Partridge* v. *Wells, 3 Stew. Eq. 176; Smith* v. *Wood, 15 Stew. Eq. 568; Somerset Bank* v. *Veghte, 15 Stew. Eq. 39; Mulford* v. *Peterson, 6 Vr. 127; 1 Pom. Eq. Jur.* §§ *418, 419; 2 Pom. Eq. Jur.* § *917.*

4. This is a proceeding for injunction and to set aside an alleged fraudulent conveyance, and the same principle declaring lapse of time a bar applies to the conveyance of the real estate as well as the personal.

*Mr. Charles H. Voorhis,* for the respondents.

I. Both suits are based on a judgment recovered November 3d, 1880, in the New Jersey supreme court, by The Hackensack

Savings Bank against Richard P. Terhune, for $3,491.54, for money lent prior to December, 1879.

II. In supplementary proceedings thereon, Judge Skinner was appointed receiver by Justice Dixon, February 29th, 1888, and on March 7th, 1888, filed his bill to recover Terhune's personal property and to have receiver's title thereto cleared of clouds, so that he might sell it to advantage and pay said judgment, and praying injunction against sale or pledge of the same by The R. P. Terhune Manufacturing Company or its directors.

The bank, on March 15th, 1888, filed its bill to have said judgment decreed a lien on Terhune's real estate, notwithstanding the deed thereof made by him on January 1st, 1880, to The R. P. Terhune Manufacturing.Company, so called.

Answers in Skinner case were filed March 26th, 1888.

Answers in bank case were filed May 25th, 1888.

Replications were filed in both causes.

Both causes were referred to Advisory Master Pitney, and heard together on the same evidence taken orally before him.

III. The receiver's bill called for answer without oath, but Terhune swore to the truth of "the statements, matters and things set forth in paragraphs Nos. 19, 20, 21, 23, 24 and 25" of his answer; and Daniel P. Morse swore that "the facts, matters and things stated and set forth in paragraphs 9 and 11" of his answer are true of his own knowledge.

The bill of the bank called for answers on oath, but all the answers were put in without oath.

IV. In December, 1879, while indebted to The Hackensack Savings Bank for money lent, Richard P. Terhune, with the help of his unmarried daughter, Maria E. Terhune, a member of his household, and his son-in-law, Daniel P. Morse, of Brooklyn, N. Y., organized, in form, a corporation called The R. P. Terhune Manufacturing Company, by a certificate dated December 30th, 1879, recorded in Bergen county clerk's office December 31st, 1879, and filed in office of secretary of state January 6th, 1880.

The nominal capital was $100,000. The subscribed capital

was $1,000. Of this Richard P. Terhune subscribed for eight shares, $800; Maria E. Terhune subscribed for one share, $100; Daniel P. Morse subscribed for one share, $100; total $1,000.

Company was to begin business January 1st, 1880, with this $1,000.

The three stockholders made themselves directors—Terhune, president and treasurer, and Morse, secretary—and authorized directors to make by-laws.

At the first meeting of directors, January 1st, 1880 (the only meeting Maria E. Terhune ever attended), this by-law was adopted, viz.:

"It shall be the duty of the president to preside at all meetings when present, and to have the general management of the business of the company; to purchase or sell any real or personal property, or make contracts for the company, and to appoint and employ such officers and assistants as he may require to conduct the business of said company."

At same meeting:

"On motion, resolved, that the president be authorized to purchase from R. P. Terhune all his real and personal property, and the treasurer be authorized to issue stock for the same."

On same, January 1st, 1880, Terhune and wife deeded to the company all his real estate "for and in consideration of the sum of twenty-five thousand dollars, subject to certain mortgages, amounting to fifteen thousand six hundred dollars lawful money of the United States of America, to them in hand well and truly paid."

This put the equity at $9,400.

This real estate was worth, according to Judge Banta, $27,000 to $31,200, and according to Judge Van Valen, $28,500 to $30,500.

According to Banta, the equity was worth $11,400 to $15,600, and according to Van Valen, the equity was worth $12,900 to $14,900.

It included his homestead in which his family then lived, and ever since have lived, and the store in which he then carried on, and ever since has carried on, the same business.

At same time Terhune also sold all his stock in the store, valued at $4,000 to $5,000, and all his goods and chattels (including even his cow and family carriage), to the company, for what consideration he does not recollect.

Ninety shares of stock were issued to Richard P. Terhune, trustee; eight shares of stock were issued to Richard P. Terhune (which, on June 1st, 1880, were transferred to Richard P. Terhune, trustee); one share to Daniel P. Morse; one share to Maria E. Terhune—one hundred shares, whole number issued.

Terhune's answer says, that "said ninety shares of stock were issued for property which he had conveyed to said company, consisting of stock in trade, personal property and real estate."

The company's answer says, "He has the whole control and management of its business, and that for such services he is only entitled to the use and occupancy of the premises where, with his family, he resides, and to the living expenses for himself and family out of said business."

There is no evidence that Mrs. Ackerman and Mrs. Terhune, the parties to be benefited, were ever consulted about this scheme.

V. To show consideration for conveying his real and personal property to the company, Terhune answers, that his purpose was "to pay and secure" [which does he mean?] what he owed his wife and mother-in-law for money received by him from Ackerman estate (of which he was executor), $6,000.

His testimony says he owed, in January, 1880, $8,000 to $10,000 (don't know exactly), for money received from that estate, all received after Ackerman's death.

Being confronted by his sworn inventory of that estate, he sees his falsehood exposed, and says, that he owed Ackerman $2,000 in his lifetime which he did not inventory.

He admits his perjury.

Of this inventory, he shows that he received of cash

| | | |
|---|---|---|
| in bank, say sixty-five per cent | $747 | 50 |
| Vanderbeek note | 600 | 00 |
| Smith mortgage | 600 | 00 |
| | $1,947 | 50 |

Terhune *v.* Hackensack Savings Bank.

| | | |
|---|---|---|
| Amount brought forward.................. ......... ......... ...... | $1,947 | 50 |
| The $31,118 mortgage was foreclosed, and land bought by the widow, who mortgaged it to Louisa Moore for $2,500, and gave him the money, he says ......... ......... ......... ......... ........, ......:.... | 2,500 | 00 |
| Add amount received in Ackerman's lifetime, if he received it.. ......... ......:...... ......... ...... ...... | 2,000 | 00 |
| | $6,447 | 50 |

The figures do not even fit the low equity he placed on the real estate, $9,400.

Proofs of the sham crop out all through the case.

Terhune says: "I paid the interest on Louisa Moore's mortgage. I had that money."

NOTE. Why should he pay that interest, if that money was part of the consideration for his deed to the company?

Linn "levels him up" thus:

"*Q.* You often speak of my property, my carrying on business. When you do that, do you mean that you individually carry on the business, or the company?

"*A.* I think that is a habit I have got."

Again, he acted as director and secretary of the gas company till the Spring of 1888, although he claims that he sold all his stock in that company to The R. P. Terhune Manufacturing Company eight years before.

It is impossible to read the pleadings and evidence and fail to see that The R. P. Terhune Manufacturing Company and R. P. Terhune are synonymous. His acts and words show their identity.

Till January 1st, 1880, he occupied the lands, possessed the personal property and conducted the business, taking for himself and his family his living and their living expenses without limit.

Since that date he, as general manager of the company, has occupied the same lands, possessed the personal property and con-

Lee v. Babcock.

ducted the same business in the same place with exactly the same benefit.

He has only "changed his habiliments," and cannot, by this device, shield his property from payment of his antecedent debts.

VI. Deed from Terhune to the company is void against the bank's debt, which it hinders and delays.

So is the transfer of his personal property, for same reason.

This deed and transfer were accompanied by a cotemporaneous arrangement for the debtor's personal benefit, practically reserving to himself the full enjoyment of the whole property, and are void for that reason. *Van Campen* v. *Ingram, 10 Cent. Rep. 879 (Bird, V. C.); S. C., 12 Atl. Rep. 537.*

The want of consideration and the absence of business method in the behavior of the parties in the purchase and transfer of the property (Terhune acting as vendor and agent of the vendee) show that the whole affair was a hollow form, and not a substantial verity.

Beyond dispute, the real object sought to be attained was, to thwart impatient creditors of Terhune, and to retain for himself and his family, in fraud of his creditors, the full and unmolested enjoyment of all his assets.

The decrees should be affirmed.

PER CURIAM.

This decree unanimously affirmed.

---

WILLIAM E. LEE, appellant,

*v.*

ANNA E. BABCOCK et al., respondents.

The peculiar language of the will, in this case, was held to give the respondent (testator's widow) a life interest in the residuary estate, *in specie*, with the right to use the same without any legal accountability to her co-executor