**PORTFOLIO FINANCIAL SERVICING CO., Servicing Agent for Jacom Computer Services, Inc. Plaintiff,**

v.

**SHAREMAX.COM, INC. and Analytics, Inc., Defendants.**

**No. COV/ 03–229(FSH).**

United States District Court,
D. New Jersey.

July 12, 2004.

Charles A. Gruen, Hackensack, NJ, for Plaintiff.

Michael P. Laffey, Cassidy Messina & Laffey, P.C., Holmdel, NJ, for Defendants.

## OPINION & ORDER

HOCHBERG, District Judge.

This matter calls upon the Court to decide whether a subsidiary is liable for the debts of its parent corporation under either the doctrine of successor liability or the doctrine of corporate alter ego. Defendants Sharemax.com, Inc. ("Sharemax") and Analytics, Inc. ("Analytics") have brought a Motion for Summary Judgment against Plaintiff Portfolio Financial Servicing Co. ("PFS"), the servicing agent for Jacom Computer Services, Inc. ("Jacom").

From approximately January 7, 2000 through July 19, 2000, Jacom, PFS's predecessor in interest, entered into a Master Lease Agreement (the "Lease") with Sharemax, the parent of Analytics. There was a default under the terms of the Lease, leaving a balance due to Jacom of $413,863.56, plus interest. Because Sharemax no longer exists, Plaintiff PFS contends that Analytics is now liable for the unpaid balance on the Lease.

## BACKGROUND

On January 14, 2000, Sharemax purchased all of the stock of Analytics, pursuant to an Agreement and Plan of Merger dated January 6, 2000, wherein Analytics merged with Analytics Acquisition Corporation ("AAC"), a wholly owned subsidiary of Sharemax. Under the terms of the merger, Analytics survived AAC and became a subsidiary of Sharemax. John C. Jensen and Harris Usdan—Analytics' president and vice president, respectively, prior to the merger, and who owned all outstanding common stock in Analytics— had their shares converted to common stock in Sharemax and executed with Sharemax employment agreements, pursuant to which they each would be retained as a vice president of Sharemax, while continuing in their respective roles as president and vice president of Analytics. Analytics received no cash or assets from Sharemax pursuant to the merger.

After Sharemax acquired Analytics, the parent and subsidiary operated as separate corporate entities in different states. Sharemax's offices were located in New Jersey, while Analytics's offices remained in Connecticut. Sharemax provided an internet system to its customers that assisted them in placing purchase orders. Analytics' business was the analysis of corporate purchasing habits.

During the two-year period after the merger, between 2000 and 2002, Sharemax encountered financial difficulties. (There has been no allegation that Sharemax had financial problems prior to the merger in 2000.) By April 2002, it was in the process of liquidating its assets and winding down its business. In May 2002, the Analytics corporate subsidiary was sold to a third-party for $75,000 paid to Sharemax. These funds were used to pay creditors of Sharemax. Sharemax later ceased to exist as a financially viable operating company.

Plaintiffs now seek to have Sharemax's Lease balance paid by Sharemax's former subsidiary, Analytics.

## STANDARD

### I. Summary Judgment

Pursuant to Fed.R.Civ.P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.,* 843 F.2d 139, 143 (3d Cir.1988). All facts and inferences must be construed in the light most favorable to the non-moving party. *Peters v. Delaware River Port Auth.,* 16 F.3d 1346, 1349 (3d Cir.1994).

The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. This requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. *See id.* at 322–23, 106 S.Ct. 2548. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party. To avoid summary judgment, the nonmoving party must demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of "genuine issue[s] of material fact" justifying trial. *Miller,* 843 F.2d at 143; *see also Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.

If a moving party satisfies its initial burden of establishing a *prima facie* case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Id.* at 587, 106 S.Ct. 1348 (*quoting First National Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

Moreover, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 860 (3d Cir.1990).

### II. Corporate Successor Liability

▮ Traditionally, New Jersey corporate law provides that "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor." *Colman v. Fisher–Price, Inc.,* 954 F.Supp. 835, 838 (D.N.J.1996) (*citing Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 340, 431 A.2d 811 (1981)); *Luxliner P.L. Export, Co. v. RDI/Luxliner,* 13 F.3d 69, 73 (3d Cir.1993); 15 WILLIAM

FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 7122 (perm. ed. rev. vol.1999) (hereinafter, "FLETCHER"). A corporation succeeds to the liabilities of another corporation only in certain limited instances. The doctrine of successor liability permits exceptions to the general rule in four such instances: (i) the purchaser expressly or implicitly agrees to assume the other company's debts and obligations; (ii) the purchase is a *de facto* consolidation or merger; (iii) the purchaser is a mere continuation of the seller; or (iv) the transfer of assets is for the fraudulent purpose of escaping liability. *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308–09 (3d Cir.1985); *Colman,* 954 F.Supp. at 838; *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 271 (D.N.J.1994). Plaintiff relies upon exceptions (i) through (iii) above. There is no allegation of fraudulent transfer.

■ In determining whether a successor corporation implicitly assumed an obligation of its predecessor, the following factors are relevant: (a) whether the successor's conduct indicated its intention to assume the debt; (b) whether the creditor relied on the conduct and the effect of any reliance; and (c) whether the successor's representatives admitted liability. *See Glynwed,* 869 F.Supp. at 275; FLETCHER, § 7124; Elizabeth A. Dellinger, *Acquisitions of Financially Troubled Companies,* (2002) in PRAC. LAW INST. CORP. LAW AND PRAC. COURSE HANDBOOK SERIES (Practising Law Institute ed., 2003). Of the above factors, Plaintiff premise its effort to impart liability on Analytics and its former principals on prong (a) only.

■ Successor liability may be found where two or more corporations combine through a merger or consolidation and the corporation or corporations that are merged cease to exist. Under these circumstances, the surviving corporation becomes liable for all of the obligations of the constituent corporations, even those liabilities which are contingent. *Arch v. American Tobacco Co.,* 984 F.Supp. 830, 841 (E.D.Pa.1997); *see generally* 8 ZOLMAN CAVITCH, BUSINESS ORGANIZATIONS § 161.02[2] (1994) (hereinafter "CAVITCH"). By contrast, where a corporation acquires the stock of another corporation and the target corporation continues to operate as a separate corporate entity, the purchaser corporation does not thereby assume the liabilities of the acquired corporation unless it does so expressly. *Arch,* 984 F.Supp. at 841; CAVITCH, § 161.02[1].

Courts have analyzed and applied successor liability by treating the "*de facto* consolidation" and "mere continuation" exceptions together. *Glynwed,* 869 F.Supp. at 275 (*quoting Luxliner,* 13 F.3d at 73 ("Much the same evidence is relevant to each determination.") (citations omitted); *Lumbard v. Maglia, Inc.,* 621 F.Supp. 1529, 1535 (D.C.N.Y.1985) (*de facto* consolidation and mere continuation theories "tend to overlap" and " 'no criteria can be identified that distinguish them in any useful manner' ") (citation and footnote omitted)).

■ In determining whether a particular transaction amounts to a "*de facto* consolidation" or "mere continuation", most courts consider four factors: (a) continuity of management, personnel, physical location, assets, and general business operations; (b) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (c) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (d) continuity of ownership/shareholders. *Glynwed,* 869 F.Supp. at 276 (*citing Philadelphia Elec. Co.,* 762 F.2d at 310 (Pennsylvania law) (citations omitted)); *Menacho v. Adamson United*

*Co.,* 420 F.Supp. 128, 133 (D.N.J.1976) (New Jersey law) (*quoting McKee v. Harris–Seybold Co.,* 109 N.J.Super. 555, 264 A.2d 98 (Law Div.1970), *aff'd,* 118 N.J.Super. 480, 288 A.2d 585 (App.Div.1972)); FLETCHER, § 7165.5; *see also Luxliner,* 13 F.3d at 73 ("In determining whether either of these exceptions applies, the fact finder must consider whether stock was part of the purchase price for the assets; whether there was a continuity of business, control or management between the two corporations; and whether the alleged successor corporation assumed the debts of the predecessor corporation.") (New Jersey law) (citations omitted).

### III. Corporate Alter Ego

██ Generally, it is "deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries." *Interfaith Cmty Org. v. Honeywell Int'l, Inc.,* 215 F.Supp.2d 482, 497 (D.N.J.2002) (*quoting Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484 (3d Cir.2001)). Liability will not be imposed on the parent corporation merely because of its ownership of the subsidiary nor because directors of the parent corporation also serve as directors of the subsidiary. *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *American Bell Inc. v. Federation of Tel. Workers of Pa.,* 736 F.2d 879, 887 (3d Cir.1984).

██ However, under both state and federal common law, abuse of the corporate form will allow courts to employ the "tool of equity" known as veil-piercing. *Publicker Indus., Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1069 (3d Cir.1979); *Star Creations Investment Co., Ltd. v. Alan Amron Development, Inc.,* 1995 WL 495126, *12 (E.D.Pa.1995) ("Whether the corporate veil may be pierced is a question of state law."). Where the parent-subsidiary relationship appears to be a facade created merely to perpetrate a fraud or evade the law, veil-piercing is permitted and shareholders (or parent corporations) may be found liable for the actions of the subsidiary. *Bestfoods,* 524 U.S. at 62–63, 118 S.Ct. 1876. In essence, veil-piercing is proper when a subsidiary is an alter ego or instrumentality of the parent corporation. *Id.; Karo Mktg. Corp., Inc. v. Playdrome America,* 331 N.J.Super. 430, 443, 752 A.2d 341 (2000).

In the Third Circuit, courts have held veil-piercing to be appropriate "when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime," *Zubik v. Zubik,* 384 F.2d 267, 272 (3d Cir.1967), or when "the parent so dominated the subsidiary that it had no separate existence," *State Dep't of Envtl. Prot. v. Ventron Corp.,* 94 N.J. 473, 468 A.2d 150, 164 (D.N.J.1983). Corporate veil-piercing analysis requires the assessment of multiple factors. *See Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209, 1222 (3d Cir.1993). Within the Third Circuit, these factors are: (i) gross undercapitalization; (ii) failure to observe corporate formalities; (iii) nonpayment of dividends; (iv) insolvency of debtor corporation; (v) siphoning of funds from the debtor corporation by the dominant stockholder; (vi) nonfunctioning of officers and directors; (vii) absence of corporate funds; and (viii) whether the corporation is merely a facade for the operations of the dominant stockholder. *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484–85 (3d Cir.2000).

██ Although the alter ego doctrine is usually employed to pierce the corporate veil of a subsidiary to reach the assets of the parent, the doctrine can also be applied in reverse to reach the assets of the subsidiary. *Official Comm. of Asbestos*

*Claimants v. G–I Holdings, Inc. (In re G–I Holdings, Inc.)*, 295 B.R. 211, 217 (D.N.J. 2003); *Massachusetts v. Bell Atlantic Tricon Leasing Corp. (In Re Mass)*, 178 B.R. 626 (M.D.Pa.1995); *In re Shailam*, 144 B.R. 626, 630 (Bkrtcy.N.D.N.Y.1992). "It is particularly appropriate to apply the alter ego doctrine in 'reverse' when the controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the pre-existing liability of the controlling party." *Select Creations, Inc. v. Paliafito America, Inc.*, 852 F.Supp. 740, 774.

 In the summary judgment context, the alter ego doctrine, whether straight-forward or in reverse, will be applied only where the plaintiff alleges and proffers genuine and material facts from which a reasonable jury could find in plaintiff's favor and from which a conclusion could be drawn that the defendant abused its corporate structure for fraudulent, unjust or inequitable purposes. Courts have applied this equitable remedy only under extraordinary circumstances. *In re Mass*, 178 B.R. at 627. *See e.g., Skidmore, Owings & Merrill v. Canada Life Assurance Co.*, 907 F.2d 1026, 1028 (10th Cir.1990) (finding the possibility that a plaintiff may have difficulty enforcing a judgment against a defendant is insufficient to justify piercing the corporate veil); *Laborers Clean–Up Contract Admin. Trust Fund v. Uriarte Clean–Up Service, Inc.*, 736 F.2d 516, 525 (9th Cir.1984) (refusing to pierce the corporate veil unless the "corporation is so undercapitalized that it is unable to meet debts that may reasonably be expected to arise in the normal course of business"); *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1522 (3d Cir.1994) (noting that corporate formalities were generally observed and, therefore, were sufficient to defeat corporate veil-piercing).

## DISCUSSION

Plaintiff PFS proffers certain evidence to argue that genuine issues of material fact exist that preclude the granting of summary judgment in favor of Defendants.

### I. "Intent" Exception to Corporate Successor Liability

First, PFS asserts that there are genuine and material facts to show that Analytics expressly or implicitly agreed to assume the debts and obligations of the now-defunct Sharemax. PFS relies on a July 1, 2002 letter from Kalei Isaza Tuzman to the Holders of Series C Preferred Stock of Sharemax.com (the "Tuzman letter"), and on the June 2002 Sale of Stock Agreement between Sharemax and Odeon Capital Partners, LP ("Odeon"), (the "Sale of Stock Agreement"), to argue that the intent of the 2000 merger was to raise capital to pay Sharemax's creditors. We now examine the materiality of each of these facts and whether a reasonable jury could conclude from either fact that the merger in 2000 was intended to raise funds to pay Sharemax creditors in 2002.

### A. Tuzman Letter

 The Tuzman letter is dated two and one-half years after the acquisition of Analytics by Sharemax. It notifies the Sharemax stockholders that the assets of Sharemax are to be sold. This letter clearly reflects the events two years after the merger, when Sharemax's financial difficulties caused it to wind down its business operations and liquidate its assets. Its equity interest in Analytics was sold for $75,000 in a sealed bidding process. The Tuzman letter does not refer in any manner to the events surrounding the merger that took place in January 2000. Any language regarding "intent" to pay off creditors refers to any proceeds of the July 2002 sale of Sharemax's interest in

Analytics to pay off creditors; it does not refer to the proceeds from the January 2000 merger.[1] The January 2000 merger is a wholly independent transaction from that of July 2002, and no genuine evidence suggests otherwise. No evidence has been proffered from which a reasonable jury could infer that, in its January 2000 purchase of Analytics, Sharemax as the purchaser had expressly or implicitly agreed to assume the debts and obligations of Analytics, the acquired company, nor that the acquired entity, Analytics, had agreed to assume the debts of the acquiror, Sharemax. In the July 2002 transaction, by contrast, Sharemax sold its entire interest in Analytics to Odeon to generate funds to pay Sharemax's creditors. There is no genuine fact tending to suggest that Sharemax imputed to Analytics the liability for Sharemax's debt. No reasonable jury could find that the Tuzman letter supports the application of the first exception to the rule of corporate successor liability; therefore, that letter does not establish a genuine issue of material fact.

### B. Odeon Sale of Stock Agreement

Pursuant to the terms of the June 2002 Sale of Stock Agreement, Odeon purchased the shares of Analytics "subject to any outstanding liens, claim and encumbrances," PFS argues that this language establishes that the intent of the 2000 merger was to use the capital raised to pay the creditors of Sharemax. PFS's attempt to apply a single legal standard to two distinct transactions in 2000 and 2002 fails. The 2002 Sale of Stock Agreement is immaterial to whether there was an express or implied intent by Analytics to assume the debt of Sharemax in 2000.

### C. Timing of Sharemax's Acquisition of Analytics and Lease with Jacom

 Finally, PFS argues that Sharemax's acquisition of Analytics was in January 2000, shortly before Sharemax entered into the Lease with Jacom; the timing of these two events is argued by PFS to be a genuine and material fact from which a reasonable jury could infer an intent by Sharemax to pay its creditors in 2002. Before and after the January 2000 transactions, Sharemax and Analytics were two independent corporate entities with different business operations and services. The Jacom Lease was not of any premises to be used by Analytics after the merger. The mere fact that one entity, Sharemax, entered into the Lease with Jacom at approximately the same time that it was also acquiring Analytics demonstrates nothing more than some "metaphysical doubt as to material facts." *See Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Plaintiff has not alleged facts to suggest any connection between the two separate transactions in 2000. Moreover, no facts have been proffered to show that, at the time the Lease was signed, Sharemax knew or could have anticipated that, more than two years later, it would face financial difficulties and have to liquidate its assets. Accordingly, the proximity of the transactions in January 2000 does not support any plausible inference by a reasonable jury of an "intent" by Sharemax's acquired subsidiary to pay a future creditor of the parent company.

### II. De Facto Consolidation or Mere Continuation Exception

 Plaintiff next asserts that there exist genuine and material facts in dispute from which a reasonable jury could infer

---

1. In fact, there were no "proceeds" from the January 2000 merger between Analytics and AAC because Sharemax had to expend capital to effect the acquisition of Analytics and the subsequent merger of Analytics and AAC.

that there was a "*de facto* consolidation" or a "mere continuation" of the seller—the second and third exceptions to the rule of corporate successor liability. PFS relies upon the employment agreements between Sharemax and John C. Jensen and Harris Usdan, principals of Analytics, in which Mssrs. Jensen and Usdan became the President and Vice–President, respectively, of Sharemax. Actually, after the acquisition, Mssrs. Jensen and Usdan retained their positions as President and Vice President, respectively, of *Analytics,* and each became *a vice president* of Sharemax. The mere fact that Mssrs. Jensen and Udan served as officers in both parent and subsidiary after the merger does not give rise to a reasonable inference that parent and subsidiary were *de facto* consolidated or that Analytics was a mere continuation of Sharemax. PFS has not proffered any evidence of a continuity of personnel, physical location, assets, and general business operations. After Analytics became a subsidiary of Sharemax, it continued to exist as a separate corporate entity, while residing in a different state and operating a different business.[2]

### III. Corporate Alter Ego

█ Plaintiff did not brief or argue the alter ego doctrine and instead relied solely upon the doctrine of corporate successor liability. Defendants, however, raised the issues of corporate alter ego in their motion for summary judgment. The application of the alter ego doctrine, whether straight-forward or in reverse, would have required PFS to include the requisite allegations and proof that the defendant abused its corporate structure for fraudulent, unjust or inequitable purposes contrary to public policy. PFS has made no such allegations, and this Court, having discovered no evidence of abuse of the corporate form or any fraud on the part of the Defendants, finds no basis for the application of the corporate alter ego doctrine.

### CONCLUSION

This Court finds that there is no genuine issue as to any material fact and that the moving parties are entitled to summary judgment.

Accordingly, **IT IS** on this 12th day of July 2004,

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that this case be **CLOSED.**

---

**2.** As consideration for all of their shares and ownership in Analytics, Mssrs. Jensen and Usdan received a combination of cash and Sharemax stock. Ownership of Sharemax stock by two corporate officers does not impute the liability of Sharemax to Analytics. *See Kingston Dry Dock Co. v. Lake Champlain Transp. Co.,* 31 F.2d 265, 267 (2d Cir.1929) (holding that a parent corporation's control of a subsidiary through stock ownership was insufficient to impose liability upon the parent corporation); *see also Luxliner,* 13 F.3d at 73 (examining a combination of factors to determine liability of the corporate successor).