752 A.2d 341 (2000)
331 N.J. Super. 430
KARO MARKETING CORPORATION, INC., Plaintiff-Appellant,
v.
PLAYDROME AMERICA, Playdrome Recreational Centers, Inc., Playdrex, Inc., Playsuper, Inc., Playbrad, Inc., Playbird, Inc., Playdrome Hightstown, Playdrome Deptford, Inc., Finnigans Deptford, Inc., Playdrome Woodbury, Inc., Playdrome Glassboro, Inc., Playdrome Burlington, Inc., Finnigans Restaurant Corp., John Izdebski, Byron Kotzas, Dave Wallach, Dave Wintrode, Eleanor Idzebski, Judith Carluccio, Mark Kotzas, John A. Izdebski, Valter Must, Esq., Rothstein, Mandell, Strohm & Must, Esqs., River Avenue Management, Daniel Carluccio, Esq., Mike Little, Donna Rein and Gary Weiner, Affiliated Real Estate, Playdrome New Jersey Limited Partnership, Playdrome West Jersey Assoc., Playdrome Burlington Assoc., New Jersey Limited Partnerships, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted April 4, 2000.
Decided June 12, 2000.
*342 Warshaw & Barnes, Red Bank, for plaintiff-appellant (Michael T. Warshaw, of counsel and on the brief).
Lebensfeld Borker & Sussman, Red Bank, for all defendants-respondents except Valter H. Must and Rothstein, Mandell, Strohm, Must & Gertner (Alan M. Lebensfeld, of counsel; Lawrence J. Sharon, on the brief).
Defendants-respondents Rothstein, Mandell, Strohm, Must & Gertner and Valter H. Must, filed pro se brief (Mr. Must, on the brief).
*343 Before Judges PRESSLER, CIANCIA and ARNOLD.
The opinion of the court was delivered by CIANCIA, J.A.D.
Plaintiff Karo Marketing Corporation, Inc., appeals the dismissal of its suit to collect on a prior judgment. We now reverse that dismissal and reinstate plaintiff's complaint.
This appeal presents questions of when the actions of judgment debtors and those who control them, cross the line from legitimate business tactics into the area of creditor fraud. The genesis of the litigation was a contract entered into between plaintiff, a marketing and advertising company and "Playdrome," a name apparently designating several interlocking companies, as described more fully below. Plaintiff provided services that were billed in excess of $134,000 but received payment of only approximately $82,000. In March 1994, it brought an action for money owed against several defendants (Karo I). It was successful against two of those defendants, Playdrome Recreation Centers, Inc. (PRC) and Playdrex, Inc., in the amount of $82,631.81 including interest. Plaintiff has been unable to collect on that judgment because PRC was defunct for some time before the litigation began and its successor, Playdrex, became judgment proof in the course of the litigation when its sole source of income, one or more management contracts, was terminated. It is plaintiff's contention that defendants in the present action intentionally and fraudulently drained Playdrex of its income stream for the explicit purpose of thwarting the judgment anticipated against Playdrex. Indeed, plaintiff claims that once the present defendants decided to render Playdrex judgment proof, the Karo I litigation defense strategy was to direct liability onto Playdrex and away from the other defendants.
Plaintiff's inability to collect on its judgment was the basis for the present litigation. Plaintiff's complaint alleged fraudulent conveyance and fraud, civil conspiracy, New Jersey RICO violations (N.J.S.A. 2C:41-1 to -6.2) and the breach of the duty of good faith and fair dealing. In essence, plaintiff contended that the defendants deliberately abandoned a company they knew would be a judgmentdebtor, Playdrex, and created a new company, River Avenue Management (RAM), to perform essentially the same management functions Playdrex had performed, for the primary purpose, indeed perhaps the exclusive purpose, of avoiding the judgment entered against Playdrex.
The defendants in this litigation and their relationships to each other may be explained as follows. Playdrome was formed as a partnership around 1986 by three men who are not defendants in the present litigation. The purpose of the undertaking was to refurbish or build and operate bowling centers, some of which included restaurants in their design. After some initial success the business expanded and in 1988 a group of investors (hereafter "Investor Group") joined the business apparently as limited partners and formed Playdrome New Jersey Limited Partnership (PNJLP). Those investors were defendants Dave Wallach, Eleanor Izdebski, Judith Carluccio, Dave Wintrode and Byron Kotzas. Apparently PNJLP then formed Playdrome America, Inc., which became the parent and holding company for the bowling centers and for the initial management company, PRC. Each bowling center/restaurant was a separately incorporated "operating company." The following defendants were operating companies: Playsuper, Inc., Playbrad, Inc., Playbird, Inc., Playdrome Woodbury, Inc., Playdrome Hightstown, Inc., Playdrome Burlington, Inc. and Playdrome Deptford, Inc. The stock of these operating companies was, in turn, held entirely by Playdrome America, Inc. Each of these operating companies had an oral management agreement with PRC. In addition there were four bowling centers owned by the *344 original founders of Playdrome which were not owned by Playdrome America, Inc. Those bowling centers also had oral management agreements with PRC but are not defendants in the present litigation.
A series of separate limited partnerships owned the real estate upon which each bowling center and restaurant was situated. Those entities are also defendants. The Investor Group held a seventy-five percent limited partnership interest in the real estate partnerships and the three original founders owned a twenty-five percent share collectively.
PRC was formed to manage the bowling centers. It determined the marketing strategy and overall policy on behalf of the various operating companies. For these services it received a six percent management fee. In 1991 PRC was abandoned as the management company for Playdrome, although it may not have been formally dissolved. A new management company, Playdrex, Inc., was created, which assumed the same role and functions as PRC. Playdrome America, Inc., apparently owned the entire stock of PRC and its successor Playdrex. The original three founders initially owned seventy-five percent of Playdrome America, Inc., and the Investor Group owned a collective twentyfive percent share. In February 1994 the founders agreed to relinquish their ownership of Playdrome in exchange for indemnification from the corporation. The Investor Group took effective control of Playdrome, although it is not entirely clear whether ownership was completely transferred, since it seems the Investor Group, two and one-half years after the agreement, had not yet completed all of its obligations to the founders. It is not entirely clear if there was a formal board of directors, but the people making the decisions for Playdrome were the Investor Group, at least after the change of control.
Two of the named defendants, John Izdebski and Daniel Carluccio, Esq., apparently do not hold stock in Playdrome but have acted as representatives of their wives who are stockholders and members of the Investor Group.
Plaintiff has also named as defendants the newest management company doing business with Playdrome, River Avenue Management, Inc., its shareholders Mark Kotzas and John A. Izdebski, and at least some of its officers, including Mike Little, Donna Rein and Gary Weiner.
The attorney who represented Playdrome in Karo I, Valter Must and his law firm, Rothstein, Mandell, Strohm and Must, are also named as defendants.
With the exception of defendant Must and his firm, we refer to the defendants collectively as the "Playdrome defendants." Plaintiff's complaint in Karo II was filed in May 1998. In October 1998 defendant Must filed a series of motions including one to dismiss for failure to state a cause of action. The Playdrome defendants filed summary judgment motions in December 1998. All the dispositive motions were heard in January 1999 and resulted in summary judgment being granted in favor of all defendants.
The motion judge's analysis focused in large part on the Uniform Fraudulent Transfer Act (UFTA), N.J.S.A. 25:2-20 to -34, and specifically on whether an asset of value existed that might have been transferred in violation of the Act. Playdrex was essentially a service corporation for the operating companies named in plaintiff's complaint. It existed to manage and coordinate the companies operating the bowling centers and their affiliated restaurants. It had few significant assets and its only source of income was an oral contract or contracts with the operating companies which contracts were terminable at will. That contractual relationship was ended by Playdrome when the Playdrome defendants created RAM and allowed it to manage the operating companies. The motion judge concluded that the Playdrex contract had no value and therefore was not an asset of value. Although a transfer of the management *345 functions had occurred it was not actionable under the UFTA.[1]
The motion judge made several other determinations. He found no common law fraud because in his view there had been no material misrepresentation by defendants and therefore no reasonable reliance by plaintiff. The New Jersey RICO claim was dismissed upon a determination that there was no predicate act to support such a cause of action and no pattern of racketeering activity. See State v. Ball, 141 N.J. 142, 661 A.2d 251 (1995), cert. denied sub nom., Mocco v. New Jersey, 516 U.S. 1075, 116 S.Ct. 779, 133 L.Ed.2d 731 (1996). He found no such cause of action in New Jersey as breach of good faith and fair dealing and in the absence of any viable cause of action, no basis for a claim of conspiracy.
We are satisfied the motion judge took too restrictive a view of plaintiff's cause of action and failed to afford plaintiff's evidence the benefit of all legitimate inferences to which it was entitled. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995); R. 4:46-2. We are persuaded that plaintiff's complaint, amended complaint and papers filed in opposition to the motions for summary judgment, when viewed in the light required by Brill, supra, demonstrate a cause of action sounding in creditor fraud and one sufficient to pierce the corporate veil of Playdrex and RAM and also to reach Playdrome America, Inc., and its primary stockholders.
The competent proofs presented by plaintiff and the reasonable inferences therefrom demonstrated at least the following:
1. Playdrome was a holding company and all of the operating companies were wholly-owned subsidiaries of Playdrome. Playdrex was a wholly-owned subsidiary of Playdrome.
2. The shareholders of Playdrome were the Investor Group and the members of the Investor Group or their representatives were also members of the boards of directors of the Playdrome entities.
3. The Playdrome entities were wholly controlled by the Investor Group.
4. Playdrex was the management company for each of the operating companies, at least from March 1992 to sometime in early to mid-1996.
5. All of the employees of Playdrome were paid by checks drawn on Playdrex funds. All of the bills for the operating companies were paid by Playdrex, and all of the receipts from the individual Playdrome locations were deposited in a Playdrex bank account.
6. The money from the various operating centers was intermingled in the Playdrex account.
7. The various Playdrome companies and Playdrex had the same CEO.
8. At a March 21, 1996 meeting, attended by members of the Investor Group or their representatives and at a subsequent meeting, the Investor Group or representatives of the individual investors apparently decided to alter the structure of Playdrome to make Playdrex defunct by forming another management company, RAM, and allowing a judgment to be taken against Playdrex. RAM may very well have been created solely for the purpose of avoiding the Karo I judgment. This transfer was concealed from plaintiff.
9. Defendant Must, the named registered agent for RAM, attended the March 21, 1996 meeting and advised the Playdrome defendants that Playdrex could be abandoned and another company created in its place.
10. No consideration was given for the transfer of Playdrex assets and functions to RAM.
*346 11. Two of the shareholders of RAM are the children of members of the Investor Group.
These allegations, if ultimately credited by a fact-finder, clearly, indeed patently, demonstrate actionable fraud. Playdrex was never an independent entity to begin with. It was the alter ego of the Playdrome holding company. Its predecessor, PRC, had the same lack of independence and was abandoned at the will of the holding company, allegedly to evade a tax obligation. When Playdrex was about to become a liability as a judgment debtor, it was effectively stripped of its only real assetthe income source from its contract or contracts with the operating companies. That action was allegedly taken for the explicit purpose of denying plaintiff the compensation it was legally due for the services it provided, in reality, not to Playdrex but to the operating companies through Playdrex. In view of its management functions, Playdrex itself had no need for the marketing and advertising services provided by plaintiff.
That defendants were clever enough to structure the transfer from Playdrex to RAM without the technical transfer of a management contract, but rather by terminating one or more contracts and recreating another, cannot serve as the basis to defeat an otherwise meritorious claim. Well over a hundred years ago in Terhune v. Hackensack Savings Bank, 45 N.J. Eq. 344, 45 N.J. Eq. 565, 19 A. 377 (E. & A. 1889), our highest Court held that to organize a corporation and convey to it all one's assets for the purpose of thwarting a creditor is fraud. It is no less fraud where the intent is shown and the consequence is clear but the perpetrators have been able to structure their wrongdoing so that resources otherwise available to the debtor are made to vanish only to reappear as the income of a "new" management company. We note that this so-called new management company, RAM, allegedly took over the space Playdrex leased, took over the computers, data and software Playdrex had used, employed the former employees of Playdrex and was apparently started with a check drawn on Playdrex funds. "It must not be thought that courts are powerless to strip off disguises that are designed to thwart the purposes of the law.... Whenever such disguises are made apparent they can readily be disrobed. The difficulty is in showing the disguises, not in penetrating them when they appear." Stockton v. Central R.R. Co. of N.J., 50 N.J. Eq. 52, 76, 24 A. 964 (Ch. 1892). That defendants' actions do not neatly fit within the terms of the UFTA do not make them less fraudulent nor less actionable.
It is not necessary for plaintiff to show a classic case of legal fraud in order to have a viable cause of action when it is otherwise demonstrated that actions have been taken for the purpose of defrauding a creditor. Thus even subsequent creditors can void a conveyance made with actual fraudulent intent. Washington Nat'l Bank v. Beatty, 77 N.J. Eq. 252, 76 A. 442 (E. & A.1910); McNulty v. McCarthy, 78 N.J. Eq. 365, 371, 81 A. 568(Ch.), aff'd, 78 N.J. Eq. 585, 81 A. 1134 (E. & A.1911). Nevertheless, the analogy to legal fraud is close enough in the present case to be significant. Implicit in plaintiff's contractual relationship with Playdrome was the promise of good faith and fair dealing. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420, 690 A.2d 575 (1997). That covenant assures that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...." Ibid. (citing Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965), in turn citing 5 Williston on Contracts, § 670 at 159-160 (3d ed.1961)). Here plaintiff may not have had a right to expect that Playdrex would always continue in business or that it would always have sufficient liquidity to pay its debts, but it certainly had the right to assume Playdrex would not be put out of business simply by altering legal identities *347 and thereby rendering it insolvent for the explicit purpose of preventing plaintiff from collecting payment on its contract and subsequent judgment. Viewed in this light, there was a promise made, relied upon and breached. As we said in Jugan v. Friedman, 275 N.J.Super. 556, 646 A. 2d 1112 (App.Div.), certif. denied, 138 N.J. 271, 649 A.2d 1291 (1994), in the context of a plaintiff's attempt to collect on a tort judgment in the face of the debtor's fraudulent conveyance of assets to his family members:
We turn next to the question whether Dr. Friedman's fraudulent interference with Mr. Jugan's efforts to collect his judgment debt is an independent tort entitling him to damages and, if so, what the measure of those damages is in the present case.

....
[The] actions by Dr. Friedman and the remedial responses reasonably taken by Mr. Jugan are closely analogous to the standard elements of legal fraud. To prove legal fraud, a plaintiff must show that the defendant made an intentionally false representation of past or present fact, intending that the plaintiff rely thereon, and that the plaintiff did rely to his detriment. Jewish Ctr. v. Whale, 86 N.J. 619, 624, 432 A. 2d 521 (1981); Ramapo Bank v. Bechtel, 224 N.J.Super. 191, 197, 539 A.2d 1276 (App. Div.1988). The anatomy of this case differs from that of a run-of-the-mill case of legal fraud only with respect to the defendant's reliance. Mr. Jugan did not undertake the present action because he was fooled by Dr. Friedman's false representations. He sued to set the purported transfers aside because he knew they were false. Nonetheless, Dr. Friedman's conduct was clearly unlawful and it is closely enough analogous to common-law fraud that we have no hesitancy in ruling, as we do, that it was tortious and that Mr. Jugan is therefore entitled to recover for damage of which that tort was the proximate cause.
[Id. at 571-572, 646 A.2d 1112.]
So too, the allegations in the present case, if established, are sufficiently analogous to the elements of legal fraud to give rise to a cause of action against those actually responsible for the perpetration of the fraud.
Plaintiff has produced ample evidence to pierce the corporate veil of Playdrex and RAM and to reach those individuals who are responsible for its inability to collect its debt. Ultimately the proofs may warrant piercing the corporate veil of Playdrome America, Inc. "Where the corporate form is used by individuals for the purpose of evading the law, or for the perpetuation of fraud, the courts will not permit the legal entity to be interposed so as to defeat justice." Trachman v. Trugman, 117 N.J. Eq. 167, 170, 175 A. 147 (Ch.1934). When a corporate entity is a mere instrument of a parent corporation so dominated that it has no separate existence and the subsidiary is used to perpetuate "a fraud or injustice, or otherwise to circumvent the law," then the corporate veil may be pierced. State, Dep't of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 500-501, 468 A.2d 150 (1983); accord Melikian v. Corradetti, 791 F.2d 274 (3d Cir. 1986).
Here the fraudulent act of rendering Playdrex judgment proof occurred before plaintiff became a judgment creditor but after plaintiff's cause of action accrued. This chronology does not impede the ability to pierce the corporate veil. The fraud was committed in the face of a known legal action and for the purpose of evading its consequences. AYR Composition, Inc. v. Rosenberg, 261 N.J.Super. 495, 506, 619 A.2d 592 (App.Div.1993).
We find no merit in defendants' contentions that plaintiff is now precluded from advancing fraud claims by virtue of what was alleged or adjudicated in Karo I. The first suit was essentially a contract action with claims sounding in breach of *348 contract, book account, quantum meruit, unjust enrichment, and "account stated." There were additional counts against James Flynn, then chief executive officer of Playdrome, alleging personal guarantee of payment and intentional interference with a contractual relationship. The last count in the complaint alleged misrepresentation against Flynn and Playdrome, but the substance of that claim was that a false representation had been made that a bankruptcy petition would be filed if creditors did not accept less than the full amount owed them. It is true that "fraud" was mentioned during the Karo I summary judgment motions, but again the fraud there alluded to was different from that which is now alleged.
Defendants' additional assertion that plaintiff should have been alerted to the present fraud claims because the only defense witness presented at the Karo I trial (Gary Weiner) said at the end of his cross-examination that "River Avenue Associates" signed his paycheck, is specious. Ultimately, the only counts presented to the jury were those for breach of contract, book account, quantum meruit and unjust enrichment. The jury was asked to decide with whom plaintiff had contracted. The current fraud allegations were neither litigated nor adjudicated.[2]
Accordingly, plaintiff's present complaint should not have been dismissed in its entirety. Plaintiff presented viable claims sounding in fraud. The allegations that defendants had breached a duty of good faith and fair dealing are components of those claims. The civil conspiracy contentions are an appropriate adjunct to the fraud claims. Board of Educ., Asbury Park v. Hoek, 38 N.J. 213, 238, 183 A. 2d 633 (1962); Landriani v. Lake Mohawk Country Club, 26 N.J.Super. 157, 159, 97 A.2d 511 (App.Div.1953).
We agree, however, that on the proofs presented plaintiff has failed to demonstrate a cause of action under the Uniform Fraudulent Transfer Act, N.J.S.A. 25:2-20 to -34, because technically no asset of value was transferred. So too, the claims made under the New Jersey RICO statute, N.J.S.A. 2C:41-1 to -6.2 fail in the absence of predicate criminal activity. See generally, State v. Ball, supra, 141 N.J. at 142, 661 A.2d 251.
Finally, we touch briefly on an issue raised on appeal but not addressed by the motion judge. At one time the Playdrome defendants were represented by an attorney named Pringle. He was apparently in attendance at the March 21, 1996 meeting when the idea was developed to abandon Playdrex in favor of a successor corporation in order to evade an impending judgment. Pringle, it seems, objected to that plan and thereafter was discharged by the Playdrome defendants. In other litigation, the exact nature of which is unclear but possibly arising out of an allegedly wrongful termination of a Playdrome officer, Pringle was deposed and made statements concerning what transpired at the March 21, 1996 meeting. Although we have not relied on that deposition in reaching our decision, on remand the question is presented whether that deposition testimony is privileged pursuant to N.J.R.E. 504 (N.J.S.A. 2A:84A-20). The record is insufficient to provide a definitive answer but the motion judge should explore, among other things, that provision of N.J.R.E. 504(2), which states, "such privilege shall not extend (a) to a communication in the course of legal service sought or obtained in aid of the commission of ... a fraud...." See Matter of Yaccarino, 101 N.J. 342, 383-384, 502 A.2d 3 (1985); In re Callan, 122 N.J.Super. 479, 300 A.2d 868 (Ch.Div.), aff'd, 126 N.J.Super. 103, 312 *349 A.2d 881 (App.Div.1973), rev'd on other grounds, 66 N.J. 401, 331 A.2d 612 (1975).
Summary judgment in favor of defendants is reversed and plaintiff's complaint is reinstated in accordance with this opinion.
NOTES
[1] He also found certain remedies under the UFTA unavailable to plaintiff even if a violation occurred.
[2] For the reasons stated, collateral estoppel does not bar plaintiff's claims, nor does the entire controversy doctrine. Plaintiff's cause of action for fraud arising from defendants' evasion of the obligation to pay the judgment did not accrue until after the judgment was entered. Circle Chevrolet v. Giordano, Halleran & Ciesla, 142 N.J. 280, 294, 662 A. 2d 509 (1995).