876 A.2d 253

BANCO POPULAR NORTH AMERICA, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. SURESH GANDI A/K/A SURESH GANDHI, MADHU S. GANDI A/K/A MADHU S. GANDHI, DEFENDANTS, AND RICHARD P. FREEDMAN, ESQ., ANGELINI, VINIAR & FREEDMAN, A NEW JERSEY GENERAL PARTNERSHIP, MICHAEL A. ANGELINI, ESQ., A PARTNER, AND CARL B. VINIAR, ESQ., A PARTNER, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS.

Argued January 20, 2004—Decided June 27, 2005.

*Samuel Feldman* argued the cause for appellant and cross-respondent (*Orloff, Lowenbach, Stifelman & Siegel,* attorneys).

*Lance J. Kalik* argued the cause for respondents and cross-appellants (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Kalik, Ronald Z. Ahrens* and *Luciana P. Lalande* on the briefs).

*Karol Corbin Walker,* Past President, argued the cause for *amicus curiae* New Jersey State Bar Association (*Edwin J. McCreedy,* President, attorney; *Ms. Walker* and *Christopher J. Carey* of counsel; *Mr. Carey* and *Kathleen A. Murphy* on the briefs).

Justice LONG delivered the opinion of the Court.

This matter involves claims by a bank against an attorney for creditor fraud, common-law fraud, and negligence. Banco Popular

North America (the Bank) avers that the attorney assisted his client in transferring assets to defraud a creditor. The Bank's interests are implicated because it issued the client loans before and after the fraudulent transfer, in reliance on the client's representations and on an opinion letter issued by the attorney. Ultimately, the client-debtor was unable to make payment on his debts to the Bank.

The first issue is whether a cause of action exists in this jurisdiction for creditor fraud that would encompass the attorney's conduct. The second is whether the attorney violated any duty to the Bank, a non-client, in connection with the fraudulent transfer or a subsequent loan. We hold that there is no cause of action for creditor fraud in this jurisdiction but that the attorney may be liable for conspiracy to violate the Uniform Fraudulent Transfer Act (UFTA), *N.J.S.A.* 25:2–20 to –34, for his participation in the transfer. We also hold that the attorney may be liable for misrepresentations he made in connection with the opinion letter he issued on the subsequent loan.

## I

This appeal ensues from a dismissal of counts of the Bank's complaint. We thus proceed gingerly because *Rule* 4:6–2(e) motions to dismiss should be granted in "only the rarest [of] instances." *Lieberman v. Port Auth. of N.Y. & N.J.*, 132 *N.J.* 76, 79, 622 *A.*2d 1295 (1993)(quoting *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 772, 563 *A.*2d 31 (1989)). Trial courts are cautioned to search the complaint

> in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary. At this preliminary stage of the litigation [a][c]ourt [should not be] concerned with the ability of plaintiffs to prove the allegation contained in the complaint.... [P]laintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.
>
> [*Printing Mart, supra,* 116 *N.J.* at 746, 563 *A.*2d 31 (internal quotations and citations omitted).]

*See also Glass, Molders, Pottery, Plastics, & Allied Workers Int'l Union v. Wickes Cos.,* 243 *N.J.Super.* 44, 46, 578 *A.*2d 402 (Law Div.1990) ("The test for determining the adequacy of a pleading is whether a cause of action is suggested by the facts."). Obviously, if the complaint states no basis for relief and discovery would not provide one, dismissal is the appropriate remedy. Pressler, *Current N.J. Court Rules,* comment 4.1 on *R.* 4:6–2 (2005) (citing *Camden County Energy Recovery Assocs. v. N.J. Dep't of Envtl. Prot.,* 320 *N.J.Super.* 59, 64, 726 *A.*2d 968 (App.Div.1999), *aff'd o.b.,* 170 *N.J.* 246, 786 *A.*2d 105 (2001)). In ruling, courts must "assume the facts as asserted by plaintiff are true and give her the benefit of all inferences that may be drawn in her favor." *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 192, 536 *A.*2d 237 (1988). We therefore treat the Bank's version of the facts as uncontradicted and accord it all legitimate inferences. We pass no judgment on the truth of the facts alleged; we accept them as fact only for the purpose of reviewing the motion to dismiss. *R.* 4:6–2(e).

## A

During the late 1990's, defendant, Suresh Gandhi,[1] operated a series of fast-food restaurants under Arby's and Burger King franchises. Separate corporations, of which Gandhi was the sole shareholder, ran each of three restaurants. Echelon Fast Food, Inc. (Echelon) ran the Arby's, and Priya Fast Foods, Inc. (Priya I) and Priya Fast Foods II, Inc. (Priya II) each operated a Burger King. In May of 1997, the Bank loaned Priya I $550,000. What financial representations Gandhi made to secure that loan are not revealed in this record; however, Gandhi executed a personal guaranty with regard to that loan. What is known is that in 1997, Gandhi jointly owned two homes with his wife, Madhu, along with securities in a mutual fund. At some point, Gandhi became

---

[1] Although the various iterations of the complaint in this case refer to Suresh Gandhi as "Suresh Gandi a/k/a Suresh Gandhi," the loan documents he executed use the spelling "Gandhi," which we adopt here.

enmeshed in a dispute with Arby's.[2]  He retained attorney Richard P. Freedman to represent him in connection with that dispute. According to Gandhi, Freedman advised him to transfer all of his assets into his wife's name in order to place them beyond Arby's reach ("the asset transfer" or "the fraudulent transfer").[3]  On April 20, 1998, Freedman prepared the deeds for both parcels and the documents that effectuated the transfer.

A few months later, on June 16, 1998, the Bank issued another loan to Priya I for $15,000.  What financial information Gandhi supplied the Bank to secure that loan is also unclear from this record.  In connection with that loan, and despite the asset transfer two months earlier, Gandhi executed a Commercial Guaranty, on June 17, 1998, in which he represented and warranted that he "*has not* and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or *otherwise dispose of all or substantially all of Guarantor's assets,* or any interest therein. . . ." (Emphasis added).  Gandhi also warranted that "no event has occurred which may materially adversely affect Guarantor's financial condition. . . ."

On July 21, 1998, the Bank issued a $750,000 loan to Priya II. According to the loan documents, that loan would not have been granted except for the fact that Gandhi executed a Guarantee of Payment, which represented among other things:

1. *Guarantee.* Guarantor unconditionally and irrevocably guarantees to Lender the prompt, absolute and unconditional payment of (i) the principal sum evidenced by the Note, (ii) interest on the outstanding principal sum evidenced by the Note . . . (iii) late charges, prepayment fees and premiums, and interest accruing on the Note after any petition under the applicable federal bankruptcy laws . . . and (iv)

---

[2] Whether litigation occurred or was merely threatened in the Arby's matter is not completely clear from the record.  Freedman states that "Arby's either sued Gandhi or threatened to do so."  In its petition, the Bank describes the Arby's matter as "a claim then pending against Suresh by Arby's," but its third amended complaint also states, "Arby's threatened litigation or commenced litigation against Suresh."

[3] Freedman denied acting with intent to undermine a creditor's interests but admitted the facts of the complaint for purposes of the motion to dismiss.

all fees, charges and expenses now or hereafter due to Lender under the Note, the Security Agreement or any other Loan Document. . . .

2. *Representations, Warranties and Covenants.* Guarantor hereby represents, warrants and covenants as follows:

. . . .

(d) Guarantor will promptly comply with all conditions of this Guarantee. Guarantor will promptly (upon transmittal or receipt) deliver to Lender copies of all notices and correspondence with respect to: (i) this Guarantee, (ii) any material adverse change in the financial condition of Guarantor, (iii) Lender's security and (iv) any violation or potential violation of any approval, authorization, or permit issued in regard to the Premises. Guarantor will promptly and fully respond to any inquiry of Lender made with respect to any of the matters described in the preceding sentence and will permit Lender, upon Lender's written request, to participate in any inquiry, hearing or meeting with regard to any of the foregoing.

. . . .

(h) *Guarantor shall provide to Lender* (i) not later than March 31 of each calendar year, *updated annual financial statements in form similar to that previously provided to Lender;* (ii) not later than thirty (30) days after filing, copies of his federal and state income tax returns; and (iii) such other financial information relating to Guarantor as may be requested from time to time by Lender.

(i) Guarantor shall promptly provide Lender with written notice of any pending or threatened litigation involving claims against Guarantor or the commencement of any proceedings or investigations by any governmental or regulatory agency with respect to Guarantor.

(j) During the term of the Loan, *provided Guarantor shall maintain a minimum net worth of not less than $950,000.00,* Guarantor shall have the right to transfer, sell or assign any real or personal property owned by him, without any requirement of obtaining Lender's consent.

[ (Emphasis added).]

Freedman negotiated Gandhi's guaranty with the Bank as well as other terms and documents relating to the $750,000 loan. As with the previous loans, the financial information Gandhi supplied to secure that loan is not contained in the record. In any case, Freedman issued an opinion letter on July 21, 1998, in relation to the $750,000 loan, in which he stated, "10. After due investigation, *we are unaware of any material matters contrary to the representations* and warranties of the Borrower or the Guarantor contained in the Loan Documents." (Emphasis added).

The Bank issued a final loan to Priya II, in the amount of $100,000, for which Priya II made and executed a Promissory Note on or about November 13, 1998. As with the previous loans,

the record is devoid of information regarding that loan. The restaurants were unsuccessful, and Gandhi defaulted on all of the Bank loans sometime after October 1999. On August 28, 2000, the Bank obtained a judgment against Gandhi for $1,251,574.58.

## B

The Bank instituted this action against Gandhi and his wife on January 11, 2001, claiming that the transfers of the houses and the mutual fund violated the UFTA. (Ultimately, the transfers were set aside, although the details of the UFTA action are not before us.) On August 1, 2001, the Bank filed a second amended complaint joining Freedman as a defendant after Gandhi testified at a deposition that Freedman had advised him to make the transfers. The Bank alleged in the fourth count of that complaint that Freedman breached the duty he owed to the Bank by negligently advising Gandhi to transfer assets, making him unable to fulfill his financial obligations to the Bank. The fifth count alleged that Freedman conspired with Gandhi to defraud his creditors.

After some procedural maneuvering that need not be recounted here, the Bank filed a third amended complaint of which counts four through seven were directed at Freedman. Essentially, after reciting the facts outlined above, those counts alleged that Freedman perpetrated common-law fraud, negligence, creditor fraud, and ethical violations in advising Gandhi to transfer his assets to defraud Arby's, in effectuating the transfer, and in issuing the misleading opinion letter on which he intended the Bank to rely. The remaining counts of the complaint alleged civil conspiracy and sought to impute liability to Freedman's partners. Freedman moved to dismiss for failure to state a claim upon which relief could be granted, and the trial judge granted the motion. *R.* 4:6-2(e). The Bank appealed.

The Appellate Division reinstated the Bank's claims for creditor fraud and civil conspiracy but upheld the trial judge's dismissal of all of the Bank's claims for common-law fraud and negligence.

*Banco Popular North Am. v. Gandi,* 360 *N.J.Super.* 414, 823 *A.*2d 809 (App.Div.2003). With respect to common-law fraud, the court concluded globally that Freedman did not make a misrepresentation, a necessary element of that cause of action. *Id.* at 421–22, 823 *A.*2d 809. By way of example, the court noted, contrary to the Bank's position, that Gandhi's Guarantee of Payment for the $750,000 loan to Priya II did not contain a representation regarding his net worth at the time of the transaction. *Id.* at 421, 823 *A.*2d 809. Instead, the court read the language in paragraph 2(j) solely as a threshold at which Gandhi would have to seek approval from the Bank prior to transferring any assets. *Ibid.* Therefore, it held that Freedman's opinion letter could not be considered a related misrepresentation of Gandhi's net worth following the asset transfer. *Ibid.*

The court next determined that Freedman's opinion letter regarding the Priya II $750,000 loan was unrelated to Gandhi's Commercial Guaranty for the $15,000 loan to Priya I, in which he represented that "he has not" and would not "dispose of all or substantially all" of his assets. *Id.* at 422, 823 *A.*2d 809. According to the court, nothing in the record suggested that Freedman was involved in that earlier transaction "or that it was in some manner incorporated into the July loan." *Ibid.* Accordingly, the court concluded that Freedman's opinion letter lacked one of the fundamental elements of common-law fraud—a misrepresentation. The court rejected the Bank's negligent misrepresentation claim based on similar reasoning. *Id.* at 425, 823 *A.*2d 809.

In reinstating the Bank's claim for creditor fraud, the Appellate Division noted that its earlier decisions in *Karo Marketing Corp. v. Playdrome America,* 331 *N.J.Super.* 430, 752 *A.*2d 341 (App. Div.), *certif. denied,* 165 *N.J.* 603, 762 *A.*2d 217 (2000), and *Jugan v. Friedman,* 275 *N.J.Super.* 556, 646 *A.*2d 1112 (App.Div.), *certif. denied,* 138 *N.J.* 271, 649 *A.*2d 1291 (1994), suggested that such a claim could be advanced when "actions have been taken for the purpose of defrauding a creditor." *Banco Popular, supra,* 360

*N.J.Super.* at 423, 823 *A*.2d 809 (quoting *Karo, supra,* 331 *N.J.Super.* at 441, 752 *A*.2d 341). The court stated:

> We agree with Banco Popular that in neither *Jugan* nor *Karo* was there a "misrepresentation" as that term is commonly understood in the context of fraud but we had no hesitancy in permitting plaintiffs' claims to proceed in each case. Indeed, we said in *Karo,* "[i]t is not necessary for plaintiff to show a classic case of legal fraud in order to have a viable cause of action when it is otherwise demonstrated that actions have been taken for the purpose of defrauding a creditor." 331 *N.J.Super.* at 441, 752 *A*.2d 341. Further, it is not material that the challenged transfers were allegedly completed with an eye on Arby's, not Banco Popular. *Jugan, supra,* 275 *N.J.Super.* at 571, 646 *A*.2d 1112; *N.J.S.A.* 25:2–25. [*Ibid.*]

We granted the Bank's petition for certification with respect to the Appellate Division's resolution of the negligence claims and Freedman's cross-petition for certification in connection with creditor fraud.[4] *Banco Popular North Am. v. Gandi,* 177 *N.J.* 495, 828 *A*.2d 922 (2003). We also granted *amicus* status to the New Jersey State Bar Association.

## II

The parties reassert the arguments advanced below. The Bank contends that Freedman negligently advised and assisted Gandhi to become insolvent through the asset transfer, which caused foreseeable harm to existing creditors; issued a "misleading" opinion letter in connection with the $750,000 loan; and performed a negligent investigation with respect to loan documents. The Bank further alleges that Freedman violated his duty of candor and honesty in failing to disclose the asset transfer and that, in any event, the trial judge's pre-discovery dismissal of its negligence claims was premature in light of the strict standard governing motions to dismiss. In addition, the Bank contends that creditor fraud is a legitimate cause of action that is "simply the tort of fraud adapted to address the misconduct of improperly thwarting a creditor." The Bank asserts that Freedman triggered

---

[4] Freedman did not challenge the Appellate Division's reinstatement of the civil conspiracy claim.

that tort by orchestrating the transfer and facilitating the Bank's issuance of the $750,000 loan with the opinion letter.

Freedman disputes the validity of a cause of action for creditor fraud because its existence would ignore fraud principles, impermissibly extend attorneys' liability to third parties, and compromise the attorney-client relationship. Furthermore, Freedman characterizes creditor fraud as duplicative in light of common-law civil conspiracy. Moreover, Freedman argues that all varieties of fraud require a misrepresentation, and the lack of a misrepresentation in this case negates any claim of creditor fraud against him.

With respect to negligence, Freedman maintains that he owed no duty to the Bank, a non-client, to disclose his client's financial condition or the asset transfer. Furthermore, Freedman argues that the Appellate Division was correct in holding that the opinion letter contains no misrepresentation to serve as a basis for liability. Lastly, Freedman contends that the Bank did not engage in sufficient due diligence before issuing loans to Gandhi and should not be permitted to foist responsibility onto its borrower's attorney.

*Amicus curiae,* the New Jersey State Bar Association, contends that a creditor fraud cause of action will place undefined duties on attorneys that directly contradict current law and hinder attorneys' ability to fulfill their professional and ethical obligations. The Bar Association urges us to carve out an exception for attorneys if we recognize a cause of action for creditor fraud because our disciplinary system provides sufficient protection against an attorney's fraudulent acts. If we rule otherwise, the Association asks that we provide guidance to attorneys on "those parties to whom a duty is owed when counseling clients in connection with financial transactions."

### III

We first address the Bank's creditor fraud argument. The law governing common-law fraud is our starting point. To establish common-law fraud, a plaintiff must prove: "(1) a material

misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 148 *N.J.* 582, 610, 691 *A.*2d 350 (1997).

Here, the Bank seeks to pursue Freedman using the tort of "creditor fraud," which is said to prohibit acts performed with the intent to purposely defraud a creditor, even in the absence of common-law fraud elements. In upholding the existence of that tort, the Appellate Division looked to *Jugan, supra,* and *Karo, supra.*

In *Jugan, supra,* a plaintiff sought to recover a punitive damage award assessed against a defendant-doctor in a prior malpractice action. 275 *N.J.Super.* at 559–60, 646 *A.*2d 1112. The plaintiff alleged that the defendant had conveyed all of his assets to his wife and three adult sons "for the purpose of defrauding his creditors" and "hindering and delaying" the plaintiff's collection of his judgment. *Id.* at 560–61, 646 *A.*2d 1112. Recounting the elements of common-law fraud, the Appellate Division noted that the plaintiff's claim differed from them only in the absence of reliance. *Id.* at 571–72, 646 *A.*2d 1112. In *Jugan,* the plaintiff did not rely on the doctor's false representations; rather, he "sued to set the purported transfers aside *because* he knew they were false." *Id.* at 572, 646 *A.*2d 1112. Noting that the doctor's unlawful actions were closely analogous to common-law fraud, the court permitted the plaintiff to recover for the tortious conduct under a creditor fraud theory. *Ibid.*

In *Karo, supra,* the plaintiff advertising company brought suit alleging fraudulent conveyance and fraud, among other claims, with respect to a judgment owed by one of the defendants. 331 *N.J.Super.* at 434–35, 752 *A.*2d 341. The plaintiff had been unable to collect on that judgment because the defendant company was defunct for some time prior to the litigation, and the defendant's successor, Playdrex, became judgment-proof during the litigation. *Ibid.* The plaintiff alleged that the defendants, who included

attorneys, terminated a management contract and formed a new company to make the original company judgment-proof. *Id.* at 435, 437, 752 *A.*2d 341.

The Appellate Division in *Karo* held that the plaintiff's allegations, if true, "clearly, indeed patently, demonstrate[d] actionable fraud." *Id.* at 440, 752 *A.*2d 341.

> When Playdrex was about to become a liability as a judgment debtor, it was effectively stripped of its only real asset—the income source from its contract or contracts with the operating companies. That action was allegedly taken for the explicit purpose of denying plaintiff the compensation it was legally due for the services it provided....
>
> [*Ibid.*]

The court concluded that it is not necessary for the plaintiff to establish legal fraud to have a "viable cause of action when it is otherwise demonstrated that actions have been taken for the purpose of defrauding a creditor." *Id.* at 441, 752 *A.*2d 341. Citing *Jugan, supra,* the court held that the defendants' conduct was close enough to legal fraud to give rise to a cause of action. *Id.* at 442, 752 *A.*2d 341; *see also Morganroth & Morganroth v. Norris, McLaughlin, & Marcus, P.C.,* 331 *F.*3d 406 (3d Cir.2003) (suggesting New Jersey would recognize an action for creditor fraud).

■■■ We disagree. The misconduct of the defendants in *Jugan* and *Karo* was unlike misconduct constituting common-law fraud. Four of the five elements required to establish fraud under *Gennari, supra,* 148 *N.J.* at 610, 691 *A.*2d 350, were absent: a misrepresentation, knowledge of the falsity of the misrepresentation, intent that a party rely on the misrepresentation, and reasonable reliance. Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them. *See Gennari, supra,* 148 *N.J.* at 610, 691 *A.*2d 350 (requiring misrepresentation and reliance in legal fraud action); *Bonnco Petrol, Inc. v. Epstein,* 115 *N.J.* 599, 609–10, 560 *A.*2d 655 (1989)(requiring misrepresentation and reliance for contract rescission based on third-party fraud); *Jewish Ctr. of Sussex County v. Whale,* 86 *N.J.* 619, 624–25, 432 *A.*2d 521 (1981)(requiring

misrepresentation and reliance for equitable fraud); *United Jersey Bank v. Wolosoff,* 196 *N.J.Super.* 553, 564, 483 *A.*2d 821 (App.Div.1984)(noting that fraud requires misrepresentation and reliance).

Although the word "fraud" is used in common parlance to connote any practice involving shady or underhanded dealing, in the law it is a term of art with a clear definition. We hold that an amorphous creditor fraud claim that requires plaintiffs to prove neither reliance nor misrepresentation does not exist in New Jersey. We conclude, as well, that its absence will wreak no injustice on litigants in this State. As will be demonstrated below, the scenarios to which our courts have applied the creditor fraud label are remediable by way of other recognized causes of action. Our conclusion dovetails with the state of the law in other jurisdictions. Indeed, creditor fraud is not recognized anywhere else in the country, and we see no warrant to acknowledge its existence here.

We therefore reverse the Appellate Division's contrary conclusion. The question then becomes what remedies are available to address Freedman's part in the asset transfer and in issuing the opinion letter.

## IV

Like the majority of our sister jurisdictions, New Jersey has adopted the UFTA. In that statute, the Legislature repealed the "uniform fraudulent conveyance law" and enacted provisions that are also in effect in forty-three other jurisdictions. Senate Labor, Industry and Professions Committee, *Statement to Assembly No. 1265,* at 1 (May 9, 1988); West Group, Annotation to *N.J.S.A.* 25:2 (Supp.2004). Under the UFTA, a transfer made or obligation incurred by a debtor is fraudulent if done:

    a.   With actual intent to hinder, delay, or defraud any creditor of the debtor; or

    b.   Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

[*N.J.S.A.* 25:2–25(a), (b).]

Those standards apply whether the creditor's claim arose before or after the transfer was made or the obligation was incurred. *N.J.S.A.* 25:2–25. The Act sets forth the indicia of "actual intent" for use in interpreting subsection a. of *N.J.S.A.* 25:2–25(a):

In determining actual intent under subsection a. of *R.S.* 25:2–25 consideration may be given, among other factors, to whether:

a. The transfer or obligation was to an insider;

b. The debtor retained possession or control of the property transferred after the transfer;

c. The transfer or obligation was disclosed or concealed;

d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[*N.J.S.A.* 25:2–26.]

The remedies available to a successful claimant under the UFTA are broad. Obviously, avoidance of the transfer is primary. *N.J.S.A.* 25:2–29(a)(1). Other remedies include attachment against the asset transferred or other property of the transferee, *N.J.S.A.* 25:2–29(a)(2); a money judgment against the transferee where the transfer cannot be undone, *N.J.S.A.* 25:2–30(a), (b); and injunctive relief. *N.J.S.A.* 25:2–29(a)(3)(a). The statute also con-

tains a catch-all provision, affording a creditor "[a]ny other relief the circumstances may require." *N.J.S.A.* 25:2–29(a)(3)(c).

The UFTA was designed as a vehicle by which creditors may recover from debtors and others who hinder their collection efforts. Yet, in enacting the UFTA, the Legislature specifically opted not to preclude related causes of action. *N.J.S.A.* 25:2–32 states, "Unless displaced by the provisions of this article, the principles of law and equity, including the law merchant[5] and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions." Thus, to the extent that the facts undergirding a UFTA claim also establish other recognized causes of action, for example, breach of contract, negligence, or common-law fraud, a creditor may pursue that claim as well.

Here, the Bank alleges that Freedman counseled Gandhi to violate and assisted him in violating the UFTA. In New Jersey, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Morgan v. Union County Bd. of Chosen Freeholders*, 268 *N.J.Super.* 337, 364, 633 *A.*2d 985 (App.Div.1993), *certif. denied*, 135 *N.J.* 468, 640 *A.*2d 850 (1994)(quoting *Rotermund v. U.S. Steel Corp.*, 474 *F.*2d 1139, 1145 (8th Cir.1973)(internal quotations omitted)). "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones v. City of Chicago*, 856 *F.*2d 985, 992 (7th Cir.1988). Most importantly, the "gist of the

---

[5] "Law merchant" is "[a] system of customary law that developed in Europe during the Middle Ages and regulated the dealings of mariners and merchants in all the commercial countries of the world until the 17th century." *Black's Law Dictionary* (8th ed.2004).

claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.' " *Morgan, supra,* 268 *N.J.Super.* at 364, 633 *A.*2d 985 (quoting *Bd. of Educ. v. Hoek,* 38 *N.J.* 213, 238, 183 *A.*2d 633 (1962)); *see also Weil v. Express Container Corp.,* 360 *N.J.Super.* 599, 614, 824 *A.*2d 174 (App.Div.), *certif. denied,* 177 *N.J.* 574, 832 *A.*2d 324 (2003).

Following the *Morgan* definition, a creditor in New Jersey may bring a claim against one who assists another in executing a fraudulent transfer. Such an action would require the creditor to prove that the conspirator agreed to perform the fraudulent transfer, "which, absent the conspiracy, would give a right of action" under the UFTA. *Morgan, supra,* 268 *N.J.Super.* at 364, 633 *A.*2d 985 (quoting *Hoek, supra,* 38 *N.J.* at 238, 183 *A.*2d 633). A creditor asserting a claim against a conspirator must satisfy the agreement and knowledge aspects of civil conspiracy and all of the underlying components of a UFTA claim: An unwitting party may not be liable under a conspiracy theory. Civil conspirators are jointly liable for the underlying wrong and resulting damages. *See Hoek, supra,* 38 *N.J.* at 238, 183 *A.*2d 633.

In this case, the Bank alleged a conspiracy cause of action against Freedman for encouraging Gandhi to violate the UFTA and for assisting him in transferring assets to avoid a creditor. The fact that Freedman was representing Gandhi during that transaction does not insulate him from liability. *Wahlgren v. Bausch & Lomb Optical Co.,* 68 *F.*2d 660, 664 (7th Cir.), *cert. denied,* 292 *U.S.* 615, 54 *S.Ct.* 862, 78 *L.Ed.* 1474 (1934). The allegations indicate that Freedman counseled Gandhi to transfer his assets to defraud a creditor, and, if proved, his assistance in facilitating the transfer reflects implicit, if not explicit, agreement to further that purpose. As such, the Appellate Division properly declined to dismiss the conspiracy count of the complaint to the extent that it was based upon a UFTA violation.[6]

---

[6] The Bank may bring this action even though Arby's was the intended defrauded party. The UFTA contemplates an action by a creditor when a debtor

# V

We turn next to the Banks claims of negligence against Freedman, with respect to which some preliminary observations are in order. Although many courts across the nation hold firm to the rule that no cause of action may be maintained against an attorney by one not in privity of contract, Joan Teshima, Annotation, *Attorneys Liability, To One Other Than Immediate Client, For Negligence In Connection With Legal Duties*, 61 *A.L.R.*4th 615 (2005), in *Petrillo v. Bachenberg*, 139 *N.J.* 472, 655 *A.*2d 1354 (1995), we recognized that there are circumstances in which an attorney may owe a duty to a third party with whom the attorney does not have a contractual relationship. In describing those situations, we began our analysis in *Petrillo* with the basic concept of duty, the inquiry with respect to which balances "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993). Further, we invoked section seventy-three of the then-proposed *Restatement of the Law Governing Lawyers*[7]:

> For the purposes of liability . . . , a lawyer owes a duty to use care . . . :
>
> . . . .
>
> (2) To a non-client when and to the extent that the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the non-client to rely on the lawyer's opinion or provision of other legal services, the non-client so relies, and the non-client is not, under applicable law, too remote from the lawyer to be entitled to protection. . . .

---

transfers assets with intent to "defraud *any* creditor of the debtor." *N.J.S.A.* 25:2–25 (emphasis added).

[7] The *Restatement (Third) of The Law Governing Lawyers* was adopted by the American Law Institute in 1998 and published in 2000. The provision quoted from the tentative draft was incorporated into the published *Restatement* and remains substantively the same. *Restatement (Third) of The Law Governing Lawyers* § 51 (2000).

[*Petrillo, supra*, 139 *N.J.* at 483, 655 *A.*2d 1354 (quoting *Restatement of the Law Governing Lawyers* § 73 (Tentative Draft No. 7, 1994)).]

We further stated:

We also recognize that attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorneys['] representations and the non-clients are not too remote from the attorneys to be entitled to protection. The *Restatement's* requirement that the lawyer invite or acquiesce in the non-client's reliance comports with our formulation that the lawyer know, or should know, of that reliance. No matter how expressed, the point is to cabin the lawyer's duty, so the resulting obligation is fair to both lawyers and the public.

[*Id.* at 483–84, 655 *A.*2d 1354.]

We relied as well on section 552 of the *Restatement (Second) of Torts:*

In effect, section 552 of the *Restatement (Second) of Torts* (1977) imposes pecuniary liability for negligent misrepresentation when an attorney "supplies false information for the guidance of others in their business transactions, . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information." [*Restatement (Second) of Torts*] at 552(1) [(1977)]. The same section limits liability to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows' that the recipient so intends or in a substantially similar transaction.

[*Petrillo, supra*, 139 *N.J.* at 484, 655 *A.*2d 1354 (quoting *Restatement (Second) of Torts* 552(2) (1977)).]

Obviously infusing *Petrillo* was a focus on the first *Hopkins* element—the nature of the relationship between the attorney and the third party. If the attorneys actions are intended to induce a specific non-clients reasonable reliance on his or her representations, then there is a relationship between the attorney and the third party. Contrariwise, if the attorney does absolutely nothing to induce reasonable reliance by a third party, there is no relationship to substitute for the privity requirement. Indeed, in *Petrillo*, we noted that "when courts relax the privity requirement, they typically limit a lawyers duty to situations in which the lawyer intended or should have foreseen that the third party would rely on the lawyers work." *Id.* at 482, 655 *A.*2d 1354 (citing Jay M.

Feinman, *Economic Negligence: Liability of Professionals and Businesses to Third Parties for Economic Loss* 131–34 (1995)). Put differently, the invitation to rely and reliance are the linchpins of attorney liability to third parties.

In *Petrillo*, we proceeded to apply those principles to the facts. The plaintiff, a buyer of property, alleged that the seller's attorney negligently provided her with excerpts from reports of two series of percolation tests, which she relied on to her detriment. *Id.* at 474–75, 655 *A.*2d 1354. More particularly, the proffered composite report indicated that eight percolation tests were administered, out of which two were successful, when in fact thirty tests were administered to reach two successful results. *Id.* at 475, 655 *A.*2d 1354. The plaintiff alleged that, relying on the misleading report, she signed a contract to purchase the property and incurred engineering expenses. *Id.* at 477, 655 *A.*2d 1354. We held that by compositing the report, the attorney effectively made a representation to the plaintiff "to provide reliable information regarding the percolation tests" and should have foreseen that the plaintiff would rely on the total number of tests when making the decision whether to sign the contract. *Id.* at 487, 655 *A.*2d 1354.

Application of *Petrillo* in later cases has engaged courts in evaluating whether the attorney invited a non-client's reliance. *See Hewitt v. Allen Canning Co.*, 321 *N.J.Super.* 178, 186, 728 *A.*2d 319 (App.Div.) (finding no duty where non-client did not rely on law firm's discovery violation and there was no misrepresentation), *certif. denied*, 161 *N.J.* 335, 736 *A.*2d 528 (1999); *Atl. Paradise Assocs. v. Perskie, Nehmad, & Zeltner*, 284 *N.J.Super.* 678, 685, 666 *A.*2d 211 (App.Div.1995) (holding plaintiff-purchasers could pursue claim against law firm because reliance on misrepresentations in content of public offering statement was foreseeable), *certif. denied*, 143 *N.J.* 518, 673 *A.*2d 276 (1996).

It is on that backdrop that the Bank's negligence counts should be evaluated.

A

The Bank's negligent misrepresentation claims regarding the asset transfer exceed the reach of *Petrillo, supra,* in nearly every respect. As we have said, the duty recognized in *Petrillo* arose because an attorney, engaged in dealings involving a non-client, made misrepresentations to the non-client knowing that they would induce her reliance. *Petrillo, supra,* 139 *N.J.* at 483–84, 655 *A.*2d 1354. Put another way, the actions of the attorney in inducing reliance created a relationship with the third party that substituted for the privity requirement. In this case, the opposite is true. In aiding Gandhi in the asset transfer, not only did Freedman make no representations to the Bank seeking to induce reliance, but the entire transaction was intended to be, and in fact was, carried out without the Bank's knowledge. Freedman did not expect third-party reliance, and no reliance, in fact, ensued. In *Petrillo,* we never suggested, even obliquely, that a duty would arise in the circumstances at hand, involving no representations, no reliance, and a remote third party with whom the attorney had no relationship.

Thus, even if harm to Gandhi's pre-existing creditors as a result of the asset transfer could have been foreseen, the lack of a misrepresentation by Freedman and reliance by the Bank fatally undermines the existence of any duty between them. *See Barsotti v. Merced,* 346 *N.J.Super.* 504, 518–19, 788 *A.*2d 802 (App.Div. 2002) (finding no duty in absence of plaintiff's reliance and evidence that defendant-attorney provided false information or "conceal[ed] or alienate[d] the proceeds" from his clients' sale of a house). We thus affirm the Appellate Division's conclusion to that effect.[8]

---

[8] The Bank's argument regarding the existence of a negligence cause of action based on *RPC* 1.2(d), prohibiting attorneys from assisting their clients in fraudulent acts, is unavailing. Although the Rules of Professional Conduct may inform the scope of an attorney's duties, those rules do not, in themselves, create a duty, and a violation of those rules, standing alone, does not form the basis of a cause

## B

██ We turn finally to the Bank's negligent misrepresentation claim against Freedman in respect of his role in negotiating the terms of the July loan and guaranty and in issuing an opinion letter in connection therewith. Obviously, that claim stands on different footing from the asset transfer. It goes without saying that representations in negotiations are made to induce reliance. Likewise, as we held in *Petrillo, supra*, "[t]he purpose of a legal opinion letter is to induce reliance by others." 139 *N.J.* at 482, 655 *A.*2d 1354. Thus, to the extent that the loan negotiations or the opinion letter contained misstatements of material facts on which Freedman knew or should have known the Bank would rely, they will support a negligence cause of action under *Petrillo*.

The only question before us is one of process: whether the complaint pleaded that cause of action. If it did, the dismissal of that count was error; if it did not, the decision to dismiss should be affirmed.

██ It bears repeating here that on a *Rule* 4:6–2(e) motion, the plaintiff must receive every reasonable inference, and "the complaint must be searched in depth and with liberality to determine if a cause of action can be gleaned *even from an obscure statement, particularly if further discovery is taken.*" Pressler, *supra*, comment 4.1 on *R.* 4:6–2 (emphasis added)(citing *Printing Mart, supra*, 116 *N.J.* at 746, 563 *A.*2d 31). In evaluating motions to dismiss, courts consider "allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 *F.*3d 217, 222 n. 3 (3d Cir.), *cert. denied.,* —— U.S. ——, 125 *S.Ct.* 271, 160 *L.Ed.*2d 203 (2004). It is the existence of the fundament of a cause of action in those documents that is pivotal; the ability of the plaintiff to prove its allegations is not at issue. *Printing Mart, supra*, 116 *N.J.* at 746, 563 *A.*2d 31.

---

of action. *Baxt v. Liloia*, 155 *N.J.* 190, 201–02, 714 *A.*2d 271 (1998); *Barsotti, supra*, 346 *N.J.Super.* at 521, 788 *A.*2d 802.

In our view, it was in the application of those standards that the Appellate Division erred. Instead of seeking to ascertain the suggestion of a cause of action that could be fleshed out with further discovery, *Wickes, supra,* 243 *N.J.Super.* at 46, 578 *A.*2d 402, the appellate panel limited its consideration to two examples of misstatements by Gandhi advanced by the Bank (paragraph 2(j) and the June guaranty) and ruled on the merits of those allegations. In so doing, the panel concluded that the former was not a representation of net worth. *Banco Popular, supra,* 360 *N.J.Super.* at 421, 823 *A.*2d 809. The panel also held that the June guaranty was not "incorporated into the July loan," and Freedman was not "involved" in that guaranty. *Id.* at 422, 823 *A.*2d 809. Those conclusions obviated the existence of a claim for negligent misrepresentation. *Ibid.* In ruling that way, the court overstepped its bounds. The issue was not whether the Bank's allegations were true or whether they could be proved, but only whether they were made.[9]

Furthermore, had the court abided by the *Printing Mart, supra,* standard and searched the complaint "in depth and with liberality," 116 *N.J.* at 746, 563 *A.*2d 31, it would have discovered the following: Gandhi's guaranty was the *quid pro quo* for the $750,000 July loan to Priya II; in order to obtain that loan, Gandhi provided financial statements representing sufficient net worth for the Bank to accept him as a guarantor; those statements were false in light of his prior divestiture of substantially all of his assets;[10] Freedman knew of the true state of affairs because he

---

[9] Even if the court had been entitled to assess the merits of the Bank's claim, it drew the wrong conclusion with respect to paragraph 2(j). Applying the *Printing Mart, supra,* standard, it is reasonable to infer that the $950,000 figure was not arbitrarily chosen but was related to Gandhi's financial representations.

[10] At this stage, it is unclear whether the reference to "previously submitted financial statements" alludes to (1) financial statements submitted a year earlier in connection with the $550,000 loan along with false representations that Gandhi's financial situation had not changed adversely or (2) entirely new financials submitted for the $750,000 loan. Either way, giving the Bank the benefit of all favorable inferences, the purpose of a guaranty makes it clear that

was the architect of the divestiture; and Freedman nevertheless negotiated the terms of the loan and rendered an opinion letter that falsely stated in paragraph ten, "After due investigation, we are unaware of any material matters contrary to the representations and warranties of the Borrower or the Guarantor contained in the Loan Documents." That Freedman intended the Bank to rely on that misrepresentation cannot be disputed: Freedman's opinion letter is addressed to the Bank and states that it is "rendered solely to, and for the benefit of [the Bank], its successors and assigns, and its counsel, and may not be relied upon by any other party." In that context, the assertion that Freedman was "unaware of any material matters contrary to the representations and warranties of the Borrower or the Guarantor contained in the Loan Documents" provided the basis for a direct misrepresentation claim against Freedman, which may be characterized as negligent or intentional.[11]

Moreover, the Bank asserted a breach of duty by Freedman that was not limited to outright misrepresentations in the opinion letter. If the facts alleged are proved, given Freedman's knowledge of the worthlessness of the guaranty, he had a duty, in light of what he had done and what he knew, either to counsel Gandhi to tell the Bank the truth and see to it that he did so or to discontinue his representation. *See Davin, L.L.C. v. Daham*, 329 *N.J.Super.* 54, 746 *A.2d* 1034 (App.Div.2000)(holding when client misrepresents or omits material fact to induce reliance by third party, attorney must counsel client to disclose truth and cease representation if client refuses). Freedman could *not* assist Gandhi in fraudulently securing further loans and, on the facts alleged,

---

Gandhi made *some* representation of financial worth sufficient to assure the Bank that he could pay the loan if Priya II defaulted. Unless that net worth figure was zero (and that is not a reasonable inference), it was false.

[11] Although the Bank did not challenge the dismissal of its common-law fraud claims, its pursuit of creditor fraud was sufficient to keep the notion of some kind of fraud alive in the case.

overstepped his bounds in penning an opinion letter on Gandhi's behalf.[12]

Whether the opinion letter resulted from sloppiness in drafting or investigation or from venality is unclear on this record. Freedman well may have some explanation for what he did. We rule only that the Bank's claims, with all inferences accorded to them, were sufficient to pass the pleadings stage of the litigation. We are aware of the Bank's status as a sophisticated party; however, that status does not immunize Freedman's alleged intentional or negligent facilitation of Gandhi's fraudulent scheme. We expect that after further discovery, including a deposition of Freedman, a trial judge will have a clear record on which to rule on any further motions. If the facts alleged are true, Freedman's conduct surpassed legal boundaries and is actionable; if not, then the case will be dismissed at a later date.

## VI

The judgment of the Appellate Division is affirmed in part and reversed in part. The Bank's claim for conspiracy in connection with the asset transfer may proceed, as may the Bank's claims of negligent and intentional misrepresentation and negligent investigation. The Bank's claims for creditor fraud were properly dismissed.

*For affirmance in part; reversal in part*—Chief Justice PORITZ and Justices LONG, LeVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.

---

[12] *RPC* 4.1(a)(2) may evidence a professional standard of care violated by Freedman in his failure to disclose to the Bank; however, the principle expressed in footnote eight, *supra*, applies with equal force to this situation.